# MASTER HOSPITAL PARTICIPATION AGREEMENT

## BETWEEN

## GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC.
## AND CAREFIRST BLUECHOICE, INC.

## AND

## WASHINGTON HOSPITAL CENTER

THIS MASTER HOSPITAL PARTICIPATION AGREEMENT is effective as of January 1, 2003 between Group Hospitalization and Medical Services, Inc. ("GHMSI"), doing business as CareFirst BlueCross BlueShield and subsidiary CareFirst BlueChoice, Inc. which will hereinafter be referred to as "Corporation", and Washington Hospital Center, hereinafter referred to as "Hospital." This Participation Agreement is a Master Agreement which may be amended from time to time, pursuant to Section VIII of the Agreement, and through the addition, alteration or elimination of those Provider Networks in which Hospital has agreed to participate. By virtue of its participation in a given Provider Network, Hospital will furnish services to Members of those Health Benefit Plans offered or administered by the Corporation (or another entity with access to the applicable Provider Network pursuant to an agreement with Corporation) which rely on that Network for the provision of Covered Hospital Services. This Master Hospital Participation Agreement and the applicable terms and conditions for participation in those Provider Networks in which Hospital agrees to participate, as set out in Appendix A, are collectively referred to herein as the "Agreement." Participation in each Provider Network is enforceable under the terms and conditions contained in the relevant subsection of Appendix A and, in the event of a conflict between the language of the Master Agreement and any subsection of Appendix A relating to a particular Provider Network, the language of the relevant subsection of Appendix A will prevail.

HOSPITAL HEREBY EXPRESSLY ACKNOWLEDGES its understanding that this Agreement constitutes a contract between Hospital and Corporation. Corporation is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, which permits Corporation to use the Blue Cross and Blue Shield Service Marks in the District of Columbia and portions of Maryland and Virginia. Hospital understands that Corporation is not contracting as an agent of the Association, and Hospital further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Corporation and that no person, entity or organization other than Corporation will be held accountable or liable to the Hospital for any of Corporation's obligations to Hospital created under this Agreement. This paragraph will not create any additional obligations whatsoever on the part of Corporation other than those obligations created under other provisions under this Agreement.

IN CONSIDERATION of mutual covenants and promises stated herein and other good and valuable consideration, the undersigned have agreed to be bound by this Agreement as of January 1, 2003, the date set by Corporation as the effective date of the Agreement (hereinafter referred to as the "Effective Date").

Form 95-HVDC-2002

## 1.    DEFINITIONS

1.1    **COINSURANCE AND DEDUCTIBLES** - If, pursuant to the terms of a Member's Health Benefit Plan, there is a shared liability for the payment amount and Corporation is obligated to pay less than one hundred percent of the payment amount, it is the Member's responsibility to pay the remaining percentage of the payment amount. This Member obligation is referred to as coinsurance. Although Members' Health Benefit Plans vary, most call for shared liability in the form of coinsurance (e.g., 80% of the payment amount to be paid by GHMSI and 20% to be paid by the Member). Coinsurance can apply to Basic Blue Shield, Hospital and Major Medical services.

The calendar year deductible is the out-of-pocket expense the Member must satisfy on covered Major Medical services before the Plan begins to make payment. Charges can accrue toward the deductible for services rendered from January 1st to December 31st of each year. Members may be billed at the time of service, or after the services are rendered, for the applicable deductible and coinsurance.

1.2    **COVERED SERVICES** are those health services provided to Members by Participating Providers, including Hospitals, which qualify for payment under the terms of a Member's Health Benefit Plan as described in the applicable Evidence of Coverage or policy, including any amendments thereto. Hospitals may obtain information needed to establish the Covered Services of any Member by using the Corporation's electronic "Access" system for Member eligibility and benefits determination.

1.3    **EMERGENCY** means a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that, in the judgment of a reasonable lay person, the absence of immediate medical attention could be reasonably expected to result in: (i) serious jeopardy to the health of a Member or a Member's unborn child; (ii) serious impairment of bodily functions; (iii) serious dysfunction of any bodily organ or part; or (iv) with respect to a pregnant Member who is having contractions, that there is inadequate time to safely transport her prior to delivery or that such transfer may pose a threat to the health or safety of the Member or Member's unborn child.

1.4    **HEALTH BENEFIT PLAN** means any group or individual, insured or self-funded health care plan established and/or administered by Corporation, (or by an affiliated entity) with access to the applicable Provider Network pursuant to an agreement with Corporation, including, but not limited to, the Federal Employee Health Benefits Program, other federal employee health benefit plans, which may be governed by Federal law and other Blue Cross and Blue Shield Plans.

1.5    **HOSPITAL -BASED PHYSICIANS** are those physicians who are employed by or under contract with Hospital for the furnishing of services over which Members have no choice or control including, but not limited to, radiologists, anesthesiologists, pathologists and emergency medicine physicians.

1.6.    **HOSPITAL SERVICES**

1.6-1    Inpatient Hospital Services will include but not limited to the following services, to the extent furnished by Hospital:

Services and supplies for or related to room and board; nursing service; intensive care; surgery and surgical recovery; labor, delivery, and nursery care; special therapies (such as physical, occupational, and speech); respiratory therapy; intravenous therapy; approved medications; diagnostic studies (including but not limited to radiological, endoscopic, and other imaging services, laboratory

Form 95-HVDC-2002

medicine, monitoring services, and nuclear medicine); anesthesia and anesthesia services; the administration of whole blood, blood derivatives, and blood components; therapeutic, rehabilitative, and palliative services; and any other hospital services which the Corporation agrees in writing to cover. These services do not include care that is convalescent, sanitarium or custodial in nature.

1.6-2 Outpatient Hospital Services will include but not be limited to the following services, to the extent furnished by the Hospital:

Services and supplies for or related to nursing service; emergency care; surgical care; special therapies (such as physical, occupational, and speech); respiratory therapy; intravenous therapy; approved medications; diagnostic studies (including but not limited to radiological, endoscopic, and other imaging services, laboratory medicine, monitoring services, and nuclear medicine); anesthesia and anesthesia services; the administration of whole blood, blood derivatives, and blood components; therapeutic, rehabilitative, and palliative services; and any other hospital services which the Corporation agrees in writing to cover.

1.7    **MEDICALLY NECESSARY** describes the use of a service or supply which is commonly and customarily recognized as appropriate in the diagnosis and/or treatment of a Member's illness or injury; appropriate with regard to standards of good medical practice; not solely for the convenience of the Member, his or her physician, Hospital, or other health care provider; and the most appropriate supply or level of service which can be safely provided to the Member in accordance with community standards and as available in Corporation's Provider Network at the time such services are required.

1.8    **MEMBER** means a person covered under any Health Benefit Plan which provides for hospital services as well as participants in other Blue Cross and Blue Shield Plans who might, on occasion, require services while in Corporation's service area.

1.9    **PARTICIPATING PROVIDER** means any hospital, physician, or other institutional or professional health care provider that has contracted with Corporation, directly or through intermediaries, to furnish Covered Services to Members.

1.10    **PROVIDER NETWORK** means a network of Participating Providers that have contracted with Corporation to furnish services to Members in accordance with specific payment and related policies and procedures established by Corporation for that network.

1.11    **EXPERIMENTAL/INVESTIGATIONAL SERVICES** – The term "experimental/investigational" describes services or supplies that are in the developmental stage and are in the process of human or animal testing. Services or supplies that do not meet all 5 of the criteria listed below are deemed to be experimental/investigational:

1.    The technology* must have final approval from the appropriate government regulatory bodies; and
2.    The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes; and
3.    The technology must improve the net health outcome; and
4.    The technology must be as beneficial as any established alternatives; and
5.    The improvement must be attainable outside the investigational setting.

* technology includes drugs, devices, processes, systems or techniques

Form 95-HVDC-2002

1.12    **THIRD PARTY PAYER** means any other entity other than Corporation, such as a health benefit plan offered by a self-funding employer and administered only by Corporation, which by virtue of its contractual arrangement with Corporation, is liable for payments to be made by Corporation to Providers participating with Corporation for the provision of Covered Services hereunder. Under these arrangements, Corporation does not assume liability for the payment of Covered Services.

## II.    PROVISION OF HOSPITAL SERVICES

2.1     **MEDICALLY NECESSARY SERVICES** - Hospital will provide Medically Necessary Covered Services to Members in accordance with the terms of this Agreement. Corporation or Third Party Payers will only bear financial responsibility for Medically Necessary Covered Services furnished to Members by Hospital and may deny payment for hospital services rendered to a Member which it determines in good faith are not Medically Necessary, subject to the right of Hospital to appeal such determination. However, Corporation will not make retroactive denials of Covered Services that were pre-certified or concurrently certified as medically necessary unless the Corporation finds in good faith that the information supplied to it for such review purposes was substantially inaccurate or misleading. In addition, the Corporation will not routinely engage in determinations of the medical necessity of particular inpatient services when they are provided as part of an inpatient stay (or individual patient day) that was pre-certified, concurrently authorized or retroactively determined to have been medically necessary and which is covered by a DRG per case or per day payment amount as prescribed in Appendix B; provided, however, that the Corporation will have the right to determine the medical necessity of any services covered by high cost outlier payments.

2.2     **COVERED SERVICES** - Corporation will define the Covered Services for each Health Benefit Plan for which Hospital has agreed to provide services and may deny payment for hospital services rendered to a Member which it determines in good faith are not Covered Services.

2.3     **STANDARD OF CARE** - Hospital will provide to Members those Covered Services which are normally provided by Hospital to the general community, in the same manner, within the same time availability and in accordance with the same standards offered to all Hospital patients.

2.4     **RELATIONSHIP WITH MEMBERS** - Corporation will not be liable for, nor will it exercise control or discretion over, the manner or method by which Hospital provides services under this Agreement.

2.5     **NON-DISCRIMINATION**

2.5-1    Hospital will provide the Covered Services contemplated herein without regard to the race, age, sex, religion, creed, color, national origin or ancestry of any Member. In addition, during the term of this Agreement, Hospital will not unlawfully discriminate against any employee or applicant for employment because of race, religion, color, national origin, ancestry, physical handicap, health status, marital status, age or sex. Hospital will include the nondiscrimination and compliance provisions of this Section in all subcontracts entered into to fulfill its obligations under this Agreement.

2.5-2    Hospital recognizes that as a government contractor with the Federal Employee Health Benefits Program, Corporation is subject to various federal laws, executive orders and regulations regarding equal opportunity and affirmative action which may also be applicable to subcontractors. Corporation, therefore, agrees that any and all applicable equal opportunity and affirmative action clauses will be incorporated herein as required by federal laws, executive orders and regulations

Form 95-HVDC-2002

2.6 **LOCATIONS –** Hospital will deliver services to Members only at locations designated by HCFA as Hospital provider-based or as approved for participation by Corporation. The payment for such services will be governed by Appendix B. Hospital will notify Corporation at least thirty (30) days in advance of the closure of any major services or at least thirty (30) days in advance other opening of any new services if it intends to bill Corporation and its patients for such services and wants assurance from Corporation that such new services will be recognized as covered services payable according to the terms and provisions of this Agreement.

## III. PAYMENT FOR COVERED SERVICES

3.1 **HOSPITAL COMPENSATION** - Hospital will be compensated for services furnished to Members in accordance with the compensation arrangements for the applicable Provider Network and the terms of each Member's Health Benefit Plan. The compensation arrangements for each Provider Network in which Hospital is participating are described in Appendix B attached hereto and incorporated herein by reference. Corporation will not be liable to Hospital for payment of applicable coinsurance or deductible amounts or for charges for services which are not Covered Services as determined under each Member's Health Plan. To the extent that Provider compensation pursuant to a particular health benefit plan is the financial responsibility of a Third Party Payer, Corporation will not be liable for such payments as a consequence of the Third Party Payer's failure to make funds available.

Payments will be made by Corporation only for inpatient and outpatient hospital Covered Services which are rendered to eligible Members and which are determined by Corporation to be Medically Necessary. Any services found by Corporation to have been not Medically Necessary, in accordance with Section 2.1 of this Agreement, and therefore ineligible for benefits from Corporation, will not be charged to a Member, except as provided in Section 3.13 below. Any information supplied by Corporation regarding a Member's eligibility for benefits will not be construed as a guarantee that benefits will be provided. Corporation will make every effort to communicate Member eligibility information to Hospital in a timely and accurate fashion, particularly as such information relates to Federal Employee Health Benefit Program participants. Benefits will only be provided upon review of a claim together with any additional documentation reasonably deemed necessary by Corporation, and in accordance with the applicable terms, conditions, and limitations of the Member's Health Benefit Plan. This clause will survive termination of this Agreement, regardless of the cause of such termination.

Corporation will make good faith efforts to produce electronic and paper transmittals of Explanation of Benefits (EOB) data, including copayment and deductible information, consistent with one another and relevant to individual dates of service.

3.2 **MEMBER IDENTIFICATION** - Hospital will be responsible for making its best efforts to establish the identity of all patients who present themselves as Health Benefit Plan Members and will promptly report to Corporation any apparent abuse of the privileges of such Health Benefit Plans. In the interest of facilitating the clear identification of such Members, Corporation will issue identification cards to its Members and will maintain and make available to Hospital its electronic "Access" system for Member eligibility and benefits information. The Access system is currently available Monday through Friday from 7:00 a.m. to 11:00 p.m. and on Saturday from 9:00 a.m. to 5:00 p.m. At other times, the Hospital will need to refer to the identification card and to defer any requests for additional information until the Access system is once again available during its normal operating hours.

3.3 **SUBMISSION OF CLAIMS** - Hospital will submit claims for Covered Services on UB-92 billing forms, or other forms as specified from time to time by Corporation or required under applicable law, within

Form 95-HVDC-2002

six (6) months of the date of discharge of Members receiving inpatient services or from the date that Members receive outpatient services, including Emergency Services. However, if a claim is submitted for third-party payment in accordance with the coordination of benefits provisions of this Agreement, the six (6) months period allowed for submission of a claim will begin on the date that Hospital receives payment or notice of denial of payment from such third party. Corporation may disallow payment of bills not submitted within the time periods specified in this Section unless Hospital can demonstrate to Corporation's satisfaction that there was good cause for the delay. Examples of such good causes are natural disasters and major information system failures.

3.4     **REQUESTED INFORMATION** - Within twenty-four (24) hours or one (1) business day, whichever is later, of being requested by Corporation, Hospital will orally or otherwise provide such information (e.g., name, address and telephone number of the attending physician; the admitting diagnosis; the proposed treatment plan; the date of onset of the condition; etc.) as the Corporation in good faith deems necessary concerning a Member and the hospital services received by or planned for the Member. If the Member has been discharged by the time the review is conducted, Hospital will provide Corporation with relevant clinical information and/or medical records within five (5) business days from the date of request or the date on which the medical records are completed.

3.5     **REIMBURSEMENT FOR HOSPITAL SERVICES** - Corporation will reimburse Hospital for Covered Services furnished to Members, in accordance with the terms of this Agreement and the terms of the Member's Health Benefit Plan.

   3.5-1   <u>Payment Period</u> - Corporation will pay Hospital within thirty (30) days of receipt of a properly completed bill in UB-92 format and which is accompanied by all required documentation, or will send a notice of receipt and status of the claim. If Corporation fails to comply with this Section 3.5-1, Hospital shall be entitled to interest pursuant to governing law.

   3.5-2   <u>Payment Amounts</u> - Payment amounts will vary according to the Provider Network charged with furnishing services to Members of that Health Benefit Plan. Such payment amounts will be based on those terms established for each Provider Network in which Hospital agrees to participate, as set forth in the applicable subsection of Appendix B.

   3.5-3   <u>Deductions</u> - In making its payments to Hospital, Corporation will pay that portion of the payment amount specified in Appendix B that is not covered by any applicable coinsurance or deductible amounts which are due the Hospital from Members in accord with their Health Benefit Plans.

3.6     **REASONABLE RATE FACTOR**

   3.6-1   <u>Definition</u> - With the exception of those circumstances cited in Section 3.6-3 below, Hospital (which shall be defined, for the purposes of this Section, to include the Hospital and any related entities that control, govern, are controlled by or are under common ownership with Hospital) will guarantee that the payments which are due it from Corporation for the care and treatment furnished to Members will be no higher than the lowest rates that would be due the Hospital from any other non-exempt payer for a similar universe of patients as defined by the methodologies outlined in this Section. This guarantee will be known as the "reasonable rate factor" (RRF) provision.

   3.6-2   <u>Confirmation of Compliance</u> - Hospital may choose either of the following two approaches as the one to be employed by the Corporation for the purpose of confirming Hospital's compliance with this reasonable rate factor provision.

Form 95-HVDC-2002

A.      Percentage of Charges (POC) Method for Both Inpatient and Outpatient
        Services

The most straightforward approach which the Hospital can elect to have the Corporation
use in its assessment of Hospital's compliance with the reasonable rate factor provision is
the POC Method. This POC method will involve a comparison of (1) the ratio of
Corporation's payments and Members' deductible and coinsurance liabilities to Hospital's
billed charges for all inpatient and outpatient Covered Services furnished to Members to
(2) the ratio of each other non-exempt payer's payments and associated Members'
deductible and coinsurance liabilities to Hospital's billed charges for each other such
payer. These payer-specific ratios will be computed on a combined basis across inpatient
and outpatient services and will be referred to as each payer's POC ratio. With the
exception of those payers specifically exempted in Section 3.6-3 below, Corporation will
be entitled to a payment rate that produces a POC ratio which is no higher than the lowest
ratio computed for any other non-exempt payer for services purchased from the Hospital
during the period covered by the Hospital's Participation Agreement with the
Corporation. In submitting this information, Hospital must display the POC ratios for the
Corporation and for each non-exempt payer but will have the right to mask the identities
of these payers.

Hospital will be required to submit the information needed to compute the relevant POC
ratios on or before October 1 of each contract year (to cover the immediately previous
January 1 through June 30 period) and on or before May 1 of the following calendar year
(to cover the previous January 1 through December 31 contract year). In submitting this
information, Hospital must display the POC ratios for the Corporation and for each non-
exempt payer but will have the right to mask the identities of these payers.

B.      Alternative Casemix-Adjusted Method of RRF Assessment for Inpatient
        Services

The POC method will be used to determine the Hospital's compliance with the RRF
provision for outpatient services unless the Corporation and the Hospital agree on the use
of a different method. In regard to inpatient services, if Hospital prefers not to use the
POC method for determination of its compliance with the reasonable rate factor
provision, it may elect to use the following casemix-adjusted method. Specifically, the
Hospital's compliance with the RRF provision for the inpatient component of its services
will be assessed by classifying Corporation's inpatients and all other inpatients covered
by non-exempt payers on a payer-specific basis by DRG using the DRG grouper used by
Corporation for payment purposes. A comparison will be made by DRG on a payer-
specific basis between (1) the amounts paid per discharge by Corporation for its Members
(plus the deductible or coinsurance liabilities of such Members) in each DRG to (2) the
amounts paid per discharge by each other non-exempt payer for its members (plus the
deductible or coinsurance liabilities of such members) in each DRG.

In performing this comparison, the amounts computed in the manner specified above in
each DRG for each non-exempt payer and its associated members will be subtracted from
the amounts computed in the manner specified above in each DRG for the Corporation.
The resulting DRG-specific differences, whether positive or negative, will be multiplied

Form 95-HVDC-2002

by the number of Corporation's discharges in each DRG. These positive and negative amounts will then be totaled over all the DRGs in which Corporation had Members. If the total amount resulting from this summation is positive for any non-exempt payer, the RRF provision will be deemed to have been violated by that amount for the inpatient component of services.

In order to determine whether the RRF provision has been violated on an overall basis, the positive or negative amount resulting from the inpatient computation described above for each non-exempt payer will be combined with the results of the outpatient POC ratio analysis for the same non-exempt payer. The amount by which the Corporation's outpatient payments and the related liabilities of its Members were greater than (or less than) the amount that would have been due for such outpatient services if the POC ratio computed above had been equal to the lowest POC ratio of any non-exempt payer will be added to (or subtracted from) the total positive or negative amount resulting from the inpatient analysis described above. If the combined inpatient and outpatient amount computed in this manner is positive, the RRF provision will be deemed to have been violated by that amount in total for the period covered by the RRF assessment.

C.    Filings and Recoveries

Hospital will submit, for informational purposes, on or before October 1 during each contract year, a letter or other document reporting the Hospital's interim assessment of whether or not it has been in compliance with the RRF provision for the immediately previous January 1 through June 30 period. If this assessment indicates that the Hospital may not have been in compliance, it should include an estimate of the absolute or percentage amount by which the RRF provision may have been violated. Corporation shall have the right to withhold Hospital remittances if this interim assessment is not filed on a timely basis.

On or before May 1 of the second year (and any subsequent years) covered by this Agreement, Hospital will submit a letter or other document providing an independent analysis of the Hospital's compliance or non-compliance with the RRF provision, in accordance with AICPA's Statements of Standards for Attestation Engagements No. 4 (SSAE No. 4), for the previous contract year (January 1 through December 31). This letter or document, which will be the basis of any recoveries due to Corporation, must be certified by the auditors that certify the Hospital's annual financial statements and must quantify the absolute and percentage amounts, if any, by which the Hospital has been out of compliance with the RRF provision during the previous contract year. This compliance analysis will be based on the results of the comparisons called for in Section 3.6-2 (A) or (B) above. It shall be the Hospital's responsibility to pay for the required certification by its auditors. Further, Corporation reserves the right to retain independent auditors to review all data and findings relied upon by Hospital in its RRF submission, as certified by Hospital's auditors. Should Corporation elect to perform such an audit, Hospital agrees to assist and cooperate with Corporation and its independent auditors in the conduct of said audit.

Corporation will have the right to receive from Hospital by wire transfer, or by means of a check to be written by Hospital to Corporation, an amount equal to the amount by which the RRF provision has been violated plus interest at the rate of one percent (1%) per month on the average balance of that amount. Any RRF payments due shall be made with

Page 8 of 21

Form 95-HVDC-2002

the annual RRF filing on or before May 1 for the previous contract period. Corporation shall have the right to withhold Hospital remittances if the annual RRF filing and/or any associated payments due are not made on a timely basis.

D.    Related Technical Matters

The Hospital should carry forward to future RRF assessment periods any claims which arise out of a particular period that have not been paid by the time the particular RRF filing is made by the Hospital. In addition, the Hospital may use any mutually agreed-upon alternative to the Medicare DRGs (e.g., the AP-DRGs) as the basis for the RRF assessment.

3.6-3    Exempt Payers and Related Reasonable Rate Factor Limitations- Payments to Hospital pursuant to the following arrangements will not be included in the evaluation of Hospital's compliance with this reasonable rate factor provision.

A.    Agreements with charitable organizations or public agencies to provide services for indigent or uninsured patients.

B.    Agreements with payers for services provided under Hospital's own employee health benefit plan.

C.    Payment for services furnished to Medicaid/Medicare/Champus beneficiaries.

D.    Agreements with payers who provide an expressly limited scope of services within one of the following categories: (a) a narrowly delineated range of subspecialized services (e.g., neurosurgery) or (b) a broader range of services for a specific payer; provided, in regard to both (a) and (b) either of the two following conditions is met: (i) the payer selects the Hospital as its exclusive community healthcare facility in the District of Columbia region or (ii) it can be demonstrated by the Hospital that the payer has concentrated at the Hospital at least 75% of the services provided to its members at Hospital. For the purposes of this section, the facilities designated as relevant for this purpose are: Georgetown University Hospital, Washington Hospital Center, Howard University Hospital, Children's Hospital and George Washington University Medical Center. The agreements covered by this section may be reimbursed based on costs, per diems, DRGs or charges (or some discount thereof) but are not based on capitation or global rates.

E.    Payments made pursuant to the Omnibus Budget Reconciliation Act of 1993, which requires Corporation to price certain claims for Members sixty-five years of age and older using the Medicare Part B equivalent amount.

F.    Agreements with payers to provide Hospital and physician professional services for specifically identified diseases or treatments on the basis of a single negotiated global fee for both provided that the Corporation is given the opportunity to enter into substantially the same arrangement at an equivalent price.

G.    Agreements with payers to provide either Hospital services or a combination of such services and physician professional services on a capitated basis provided that the

Form 95-HVDC-2002

Corporation is given the opportunity to enter into substantially the same arrangement at an equivalent price.

H.      Agreements with payers that are owned by the Hospital or by the same entity that owns the Hospital, or any payer in which the Hospital or its owner has a substantial ownership interest. For purposes of this section, "substantial ownership interest" shall be defined as fifteen percent (15%). It is further understood that the rates in these agreements shall not be greater than 15% lower than those rates offered to Corporation pursuant to this Agreement.

I.      Agreements with payers that account for four percent (4%) or less of Hospital's total admissions or for a number of admissions that is equal to 2.5 or more times the number of admissions accounted for by the Corporation during the time period covered by the RRF compliance determination; provided, however, that the two largest private sector payers at the Hospital other than Corporation shall not be exempt from this RRF provision solely because they account for four percent (4%) or less of Hospital's total admissions.

3.6-4   In interpreting the meaning of the words "substantially the same arrangement at an equivalent price" as used in Sections 3.6-3 F and 3.6-3 G, above, it shall be understood that the Corporation shall be entitled to pay global fees or capitation rates for designated services that are identical or reasonably similar to those offered by Hospital through agreements with other payers (1) if Corporation contracts with the Hospital for an identical or reasonably similar package of services to be covered by the global fee or capitation rates; and (2) Corporation provides the Hospital with a volume of business at least equal to that provided under the agreement with the other payer. If, based on an annual reconciliation, Corporation fails to meet the volume threshold which triggers the global fee or capitation rates during any one contract year, then such services shall be reimbursed retroactively in accordance with the negotiated non-global, non-capitated rates for Hospital pursuant to Appendix B and for physician professional services as separately set forth in the Master Physician Participation Agreement.

3.6-5   The reasonable rate factor provision shall not apply with respect to patients who are members of Kaiser Foundation Health Plan of the Mid-Atlantic States or its affiliates if at least seventy-five percent (75%) of the services provided to its members at the hospitals listed in subparagraph D of paragraph 3.6-3 are provided at the combination of Hospital and Georgetown University Hospital.

3.6-6   Notwithstanding any provisions of this Section 3.6 to the contrary, the reasonable rate factor provision will not apply during the term of this Agreement to Hospital if Hospital or its direct or indirect parent corporation experienced a deficit of revenue under expenses of at least $10 million during fiscal 2002 as reflected on its audited financial statements.

3.7     **MEMBERS TO BE HELD HARMLESS** - Hospital hereby agrees that in no event, including, but not limited to non-payment by Corporation or any entity with access to this Agreement by virtue of a contract with Corporation, for any reason, including a determination that the services furnished were not Medically Necessary, Corporation's insolvency, Hospital's failure to submit claims within the time period specified in Section 3.3 above or breach of this Agreement, will Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons other than Corporation for Covered Services provided pursuant to this Agreement. This provision will not prohibit collection of applicable copayments or deductibles billed in accordance with the terms of Corporation's agreements with Members, nor will it prohibit Hospital from collecting payments from Members for Non-

Form 95-HVDC-2002

Covered Services or for services that were not Medically Necessary where the Hospital has notified the Member in advance of his or her payment responsibility in accordance with Section 3.12 and Section 3.13 of this Agreement.

Hospital further agrees that this provision: (1) will survive the termination of this Agreement regardless of the cause giving rise to such termination; (2) will be construed to be for the benefit of Members; and (3) supersedes any oral or written agreement to the contrary now existing or hereafter entered into between Hospital and Members or persons acting on the Members' behalf. Any modification, addition or deletion to this provision of this Section will become effective on a date no earlier than thirty (30) days after the Commissioner of Insurance of the State of Maryland and the State Corporation Commission of the Commonwealth of Virginia have received written notice of such proposed changes.

3.8    **THIRD PARTY PAYMENT** - Members may be eligible for coverage from another payer, such as, but not limited to, group health benefits plans, liability insurers, entities providing workers' compensation or occupational disease coverage, Medicare or other government programs. The parties will use their best efforts to inform each other whenever a Member has coverage from such other payers. Hospital will use its best efforts to collect payment from third party payers, following its customary collection procedures, whenever such payers have primary responsibility to provide or pay for Covered Services in accordance with the coordination of benefits ("COB") and third-party liability requirements of Member's Health Benefit Plan to the extent permitted by law.

If Corporation is required to pay a portion of Hospital's charges for Covered Services not covered by primary payers, Corporation will pay Hospital only that amount which, when added to the amounts paid or owed by the other payers (and any copayment, deductible or coinsurance charges which the Member is required to pay) will not exceed the Hospital's agreed-upon payment amount for such services pursuant to this Agreement. In those situations in which Medicare is the third party payer with primary responsibility, the amount payable by the Corporation, when added to the amount paid or owed by the primary payer and the amounts owed by the Member, will equal the Medicare allowed amount. In accordance with Section 3.7 above, Hospital will not bill, charge, seek compensation, remuneration or reimbursement from, or have any recourse against Members, for amounts in excess of these agreed upon allowances.

3.9    **DUPLICATE BILLING** - Unless otherwise instructed by Corporation, Hospital agrees to use its best efforts to refrain from submitting more than one bill to Corporation for the same Covered Services furnished to a Member pursuant to this Agreement. Hospital will not, under any circumstances, including a delay in Corporation's processing of Hospital's claims, bill Members for Covered Services which are the subject of such claims.

3.10    **ADJUSTMENTS** - Either party will be entitled to request an adjustment of payment if it notifies the other of an overpayment or underpayment within six (6) months following the date of such payment by reason of, but not limited to, an inappropriate denial of payment for Covered Services or failure to pay the full amount due for such services. Except for those payments referenced 3.8, 3.11 and 3.14 of this Agreement as well as the Federal Employee Health Benefit Program, administrative services only (ASO), or other health plans not subject to State insurance laws and regulations (for purposes of this paragraph, the "Excepted Plans"), all payments will be final unless an adjustment is requested within this six (6) month period. With regard to the Excepted Plans, Corporation agrees to begin working toward parity of the time frames for requesting an adjustment by modifying employer group agreements upon renewal starting July 1, 2003. With respect to the Federal Employee Health Benefit Program, the issue of parity will be initiated by the Corporation and will be pursued jointly by MedStar Health and the Corporation. Corporation agrees to use its best efforts to modify all employer group agreements associated with the Excepted Plans to achieve parity by June 30, 2004, or the next renewal date; Hospital acknowledges that Corporation will not be able to ensure parity until all employer group agreements have been renewed.

Form 95-HVDC-2002

3.11    **OFFSET OF OVERPAYMENTS** - In the event any incorrect payments are discovered by Corporation as a result of an audit or by any other means, Hospital agrees to refund to Corporation the net of any erroneous payments. Corporation agrees to notify Hospital in writing of an erroneous payment not less than thirty (30) days prior to recoupment. If Hospital does not object to the recoupment, it shall remit the amount due to Corporation within the specified timeframe. If Hospital does not agree with the recoupment, Hospital must notify Corporation of its objection to the recoupment orally or by a written communication to the Corporation's representative (who will be identified in the written notification from the Corporation) within the thirty (30) day timeframe that will be specified in the Corporation's recoupment notice. If the oral communication with the Corporation's representative does not result in resolution of the issue to the satisfaction of the Hospital, Hospital shall file a written communication with the Corporation's representative. Upon oral resolution of the issue, or upon receipt of a written objection from the Hospital, Corporation will cease all recoupment efforts and will initiate the appeal process. If the Hospital does not object to the recoupment, or if the appeals process upholds all or part of the recoupment, Hospital must remit the amount due to Corporation either within the timeframe (i.e., 30 days) specified in the recoupment notice received from the Corporation or within the timeframe specified during the appeals process. If oral communication does not resolve the recoupment issue, or if a refund or a written communication disputing the recoupment is not received by the Corporation within thirty (30) days of its notifying Hospital of its obligation to remit same, Corporation will deduct the amount which was to be refunded from future payments due Hospital. If the Hospital does not file an objection to a recoupment within the specified thirty (30) days timeframe specified above, it may nevertheless subsequently file an objection to the recoupment by registering an appeal through the electronic query system provided that the appeal is registered within the six (6) month timely filing limit specific in Section 3.10. Corporation agrees to use its best efforts to resolve all appeals, including those filed within and after the specified thirty (30) day timeframe, within thirty (30) days of receiving the appeal notice. If Corporation and the Hospital are unable to resolve any issues related to such recoupments within ninety (90) days after Corporation receives the appeal notice, Hospital or Corporation may take this issue to binding arbitration pursuant to Section 9.3.

3.12    **NON-COVERED SERVICES** - It is recognized that Members may request services of Hospital which are not Covered Services and which are, therefore, payable by the Member. In all such cases, Hospital agrees to use best efforts to advise Members in writing of their payment responsibility prior to rendering such services. In no event will Corporation be responsible for any amount of money owed by a Member to Hospital for such non-Covered Services in the event that Hospital is unable to collect such amount from a Member. Corporation acknowledges that it is not the responsibility of the Hospital to interpret an individual Member's benefits. Hospital acknowledges that is their responsibility to verify benefits prior to rendering services.

3.13    **SERVICES NOT MEDICALLY NECESSARY** - Neither Members nor Corporation will be liable for any health care services which are determined, pursuant to applicable utilization review or quality improvement procedures, to be not Medically Necessary, except where the Member requests such services after being informed in writing prior to receiving the services that they are not deemed Medically Necessary. In such cases, the Member will be solely responsible for paying for such services. In no event will Corporation be responsible for any amount of money owed by a Member to Hospital for such medically unnecessary services in the event that Hospital is unable to collect such amount of money from a Member. As stated in Section 2.1, Corporation will restrict its use of retrospective reviews of medical necessity.

3.14    **INELIGIBLE MEMBERS** - Corporation is not obligated to make payment to Hospital for services provided to any individual who is not, at the time such services are received, a duly eligible Member. The fact that an individual possesses an identification card will not obligate Corporation to pay for or provide services if, on the date(s) that such services were rendered, the individual is, or is later found to have been, ineligible for coverage under a Health Benefit Plan. Authorization by Corporation to furnish services to Members does not

Form 95-HVDC-2002

guarantee that the Member is eligible for benefits and/or that the services furnished are Covered Services under the Member's Health Benefit Plan.

## IV.    COMPLIANCE WITH CORPORATION'S POLICIES AND PROGRAMS

4.1    **REGULATORY COMPLIANCE AND ACCREDITATION** - Hospital warrants that it is, and at all times during this Agreement will remain, in compliance with all applicable local, state and federal laws, rules and regulations including, but not limited to those: (a) regarding licensure, certification, and accreditation; (b) necessary for participation in the Medicare and Medicaid programs; and (c) regulating the operations and safety of hospitals. Hospital further warrants that it is, and at all times during this Agreement will remain, accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") or any successor organization and any other accreditation organization reasonably requested by Corporation. Hospital also warrants that, to the extent applicable, it will satisfy all relevant requirements established by the National Committee for Quality Assurance ("NCQA"). Hospital will provide Corporation with available documentary evidence of its compliance with the foregoing requirements and will notify Corporation immediately if it is notified or otherwise becomes aware that it does not comply with these requirements at any time during the term of this Agreement.

4.2    **PARTICIPATING PROVIDER MANUAL** - The operational procedures to be followed in implementing Corporation's general policies and procedures, those specific policies and procedures relating to the Provider Networks in which Hospital has agreed to participate, as well as those governing the Health Benefit Plans to be served by these Provider Networks, will be set forth in the applicable Participating Hospital Manual to be furnished to Hospital by Corporation at least sixty (60) days prior to the effective date of this Agreement. The Participating Hospital Manual, the terms of which are incorporated herein by reference, is subject to modification from time to time at Corporation's sole discretion. Corporation will notify Hospital in writing of any proposed modification and will give Hospital thirty (30) days in which to submit comments regarding the proposed modification. At the end of this period, Corporation will give the Hospital fifteen (15) days notice before implementation of any such modification. In the event of a conflict between the provisions of this Agreement and the provision of the Participating Hospital Manual, the provision of this Agreement shall control.

4.3    **HOSPITAL-BASED PHYSICIAN SERVICES** - Hospital understands and agrees that its participation in Corporation's Provider Networks is contingent upon the full participation in same of all of its hospital-based physician groups and services. Accordingly, Hospital will cooperate with Corporation in securing such participation.

4.4    **UTILIZATION MANAGEMENT/QUALITY IMPROVEMENT**

4.4-1    <u>Hospital Program</u> - Hospital will conduct programs of utilization review, discharge planning and quality improvement which are designed to assure cost-effectiveness, efficiency in the utilization of resources, and quality care in all inpatient and outpatient services rendered to Members. These programs must be conducted by Hospital's professional staff under the authority of Hospital's governing board and records of all such activities must be made available to Corporation upon request subject to applicable law. For Members whose services are not contractually subject to a program of pre-admission review and concurrent review by Corporation, Corporation may conduct retrospective utilization review of Hospital records applicable to such Members.

4.4-2    <u>Corporation's Program</u> To the extent that Hospital participates in Provider Networks for Health Benefit Plans which have implemented utilization management and/or quality improvement policies and programs, Hospital will fully cooperate and comply with such policies and programs.

Form 95-HVDC-2002

Hospital's failure to comply with such policies and programs may result in full or partial denial of payment to Hospital.

4.4-3   Medically Necessary Hospital Services - Hospital has been retained to provide Medically Necessary services to Members in accordance with the utilization management requirements of Corporation's programs. Corporation may deny payment to Hospital for services, including Covered Services, which do not meet the requirements of a Medically Necessary service, as defined in this Agreement. Hospital may not bill Members for medically unnecessary services unless, as provided in Section 3.13, the Member is notified in writing prior to the delivery of such services that they are not medically necessary and the Member will be responsible for paying for them.

4.4-4   Review of Hospital Records and Services - Hospital will permit Corporation to conduct or have conducted, at Corporation's expense, off-site and on-site reviews and evaluations of Hospital's records and of services provided to Members pursuant to its utilization management and/or quality improvement programs. Upon reasonable notice, Hospital will permit representatives designated by Corporation to visit hospitalized Members and will provide the space and information reasonably necessary to conduct such activities. Hospital further agrees that Corporation's utilization review coordinators may call appropriate representatives of Hospital during regular business hours for reports concerning the status of Members receiving services from Hospital.

4.5   **ACCESS TO BOOKS AND RECORDS** - Hospital will maintain medical, financial and administrative records concerning services provided to Members in accordance with relevant federal and state laws, JCAHO and NCQA guidelines and generally accepted business practices. Corporation, its authorized representatives and government agencies will have the right to inspect, review, and make or obtain copies of such records directly related to services furnished to Members, pursuant to this Agreement, upon fifteen (15) days notice, during regular business hours and without audit fees or other charges to Corporation. All reviews shall be conducted by authorized individuals and maintained as confidential documents, not to be disclosed to third parties except as required by law. Corporation acknowledges that, for purposes of certain on-site reviews, Hospital may require Corporation's authorized representatives or Business Associates to sign a confidentiality agreement with Hospital. Hospital will furnish copies of admission, discharge, operative or emergency room reports relating to the services provided pursuant to this Agreement upon request to Corporation and its authorized representatives and will not charge either Corporation or its Members for such copies; provided, however, that Corporation will use its bests efforts to limit its requests for such copies to the number that is essential for its activities pursuant to this Agreement. Corporation warrants to Hospital that Members have agreed to release of their medical records to Corporation, and Hospital agrees that Corporation will not be required to obtain additional medical releases from such Members in order to inspect, review, or make copies of Members' medical records. Upon written request, either party shall provide the other party with a copy of its Corporate or individual audited financial statements on an annual basis within thirty (30) days after such statements are available. The parties to this Agreement agree that all requests by Corporation and disclosures by Hospital are subject to the minimum necessary standards under HIPAA. This provision will survive the termination of this Agreement, regardless of the cause-giving rise to such termination.

4.6   **CONFIDENTIALITY OF MEMBER INFORMATION AND MEDICAL RECORDS** - Hospital will maintain the confidentiality of Member information and information contained in Members' medical records and will only release such records: (1) in accordance with Section 4.5 above; (2) subject to, or as required by, all applicable state and federal laws regarding, among other things, the confidentiality of patient records and the privacy of protected health information ; (3) as necessary to other providers treating the Member; (4) to hospital medical review committees; or (5) with the consent of the Member. This Section will not be construed to prevent the Hospital from permitting firms, organizations or individuals engaged by the Hospital to abstract, computerize and/or analyze such records nor will it prevent the Hospital from releasing

Form 95-HVDC-2002

medical record information to firms, organizations or individuals taking part in research, experimental, educational or other programs provided that there is no identification of the Member in the released information.

Corporation and its Business Associates shall at all times comply with the requirements of HIPAA and related regulations and any applicable state and federal laws governing the confidentiality and privacy of protected health information. Corporation shall make available to Hospital and maintain a current, up-to-date listing of those entities with whom it has entered into Business Associate Agreements (as defined by HIPAA), including disease management companies, acting on behalf of Corporation, that may seek to obtain Protected Health Information ("PHI") from Hospital on Members of Corporation. Corporation warrants that it has disclosed in its Notice of Privacy to its Members that is has such relationships with the parties to obtain PHI on its Members. Corporation indemnifies Hospital from all claims, liabilities or other causes of action arising by reason of the Corporation's acts or omissions related to Hospital's release of PHI to Corporation or Business Associates of Corporation or relating to their use of PHI after it is released by Hospital pursuant to this Agreement. This provision shall survive the termination of this Agreement, regardless of the cause-giving rise to such termination.

4.7 **MEMBER COMPLAINTS** - Hospital agrees to cooperate fully with Corporation in the investigation and resolution of Member complaints and grievances concerning services provided under this Agreement. Each party will notify the other within fifteen (15) working days of substantive complaints received from Members regarding Hospital or Corporation or concerning any services rendered by Hospital under this Agreement. Each party will furnish the other party with a copy of its procedures for handling such complaints upon request.

4.8 **APPEALS** - Corporation will maintain a formal appeals process which utilizes appropriately qualified medical specialists so that Hospital may appeal adverse payment and coverage decisions made by Corporation. Corporation will use its best efforts to render a determination **within thirty (30) days of receipt of all information requested as part of the appeal.** Corporation will provide Hospital with a description of the medical appeals process prior to the effective date of this Agreement and will notify the Hospital in a timely manner of any significant changes in this process. Corporation agrees to appoint one Board Certified physician designated by Hospital's parent corporation to its committee that considers medical appeals.

## V.    RELATIONSHIP OF THE PARTIES

5.1 **INDEPENDENT CONTRACTOR** - Hospital and Corporation are independent contractors. This Agreement is not intended to create an employer-employee, partnership or joint venture relationship between Corporation and Hospital or their respective directors, officers, employees or agents. Corporation shall not have the authority to exercise control or direction over Hospital or health care services rendered by Hospital. Corporation shall not interfere with the methods or means by which Hospital renders services to patients. Corporation shall not interfere with the relationship between Hospital and its medical staff.

5.2 **NON-EXCLUSIVITY** - Corporation may contract with any hospital, physician, or other health care provider to become a Participating Provider upon such terms and conditions as it deems appropriate, without the prior consultation or approval of Hospital. Hospital may participate in any other health care delivery system and provide hospital services independent of and apart from the Covered Services to be provided to Members pursuant to this Agreement, as long as such participation or practice does not preclude Hospital from complying with the terms of this Agreement.

Form 95-HVDC-2002

5.3    **ACCESS TO PROVIDER NETWORKS** - The parties understand and agree that Corporation may contract with other affiliated entities-- including subsidiaries, other Blue Cross and/or Blue Shield Plans, and entities in which the Corporation has at least a fifteen percent (15%) financial interest-- in order to give them access to and use of those Provider Networks in which Hospital participates. Corporation shall provide Hospital with thirty (30) days' advance notice of its entering into any such contracts. Upon execution of any such contract, Hospital understands and agrees that it will furnish services to affiliated entities in accordance with the same terms and conditions of participation and compensation as apply when such services are furnished to Corporation's Members, as set out in this Agreement and in the applicable subsections of Appendix A and Appendix B.

5.4    **MARKETING** - Corporation will market Health Benefit Plans that incorporate significant financial incentives for Members to utilize the services of Participating Providers. Hospital consents to Corporation's use of Hospital's name in lists of Participating Providers prepared for distribution to Members and potential Members. Corporation consents to Hospital's use of Corporation's name and logo in general materials prepared by Hospital indicating those Health Benefit Plans for which Hospital provides services. Corporation and Hospital each reserve the right to control the use of its name, symbols, trademarks, and services marks presently existing or later established. In addition, neither Corporation nor Hospital shall use the other party's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise, without the prior written consent of the other party. Both parties shall cease any such usage of the other party's name, symbols, trademarks, or service mark in advertising or promotional materials immediately upon written notice from either party or upon termination of this Agreement. This provision does not apply to Corporation's use of the Hospital's name and address in marketing and sale and/or service materials provided to members, such as directories distributed during the open-enrollment process.

5.5    **COOPERATION** – Hospital, on behalf of or in communications with its patients, other Hospitals or Physicians and/or healthcare professionals, will not take any action or make any communication which undermines or could undermine the confidence of Members, potential Members, their employers, their unions, Hospitals, physicians or other healthcare professionals or the public in Corporation or in the quality of care provided to Corporation's Members; but will instead seek to resolve its differences directly with Corporation in a professional manner and without involving Members. Corporation encourages Hospital to discuss all medical option with Members without regard to benefit availability.

5.6    **COMPLIANCE** – Each party agrees and will warrant to the other that it shall comply fully with all federal and state statutes, regulations and/or rules in all relevant jurisdictions applicable to its operations and its performance under this Agreement.

5.7    **OPERATIONS COMMITTEE** - Hospital and Corporation will each appoint a Co-Chair to the Operations Committee ("Committee"). Each Co-Chair will be responsible for ensuring that the appropriate representative of the respective parties attend and participate in meetings of the Committee. Meetings will be held as frequently as required and agreed upon by the Co-Chairs but not less than quarterly. The purpose of the Committee is to consider and address the day-to-day operations of the parties as they relate to the execution of the terms of this agreement. Hospital and Corporation represent that they will be supportive of this Committee, however, the Committee will have no formal authority over either party or this Agreement. Any decision made by the Committee is subject to the mutual agreement of both parties.

## VI.    INSURANCE AND INDEMNIFICATION

6.1    **INSURANCE COVERAGE** - Hospital will maintain, at Hospital's sole expense, and keep in force, adequate policies or self-insured programs providing comprehensive general liability, professional

Form 95-HVDC-2002

liability and other insurance, as may be necessary to insure Hospital and Hospital's agents and employees against any claim or claims for damages arising out of the rendering of or failure to render professional services pursuant to this Agreement. Policy limits of professional malpractice coverage must be no less than $1 million per occurrence and $3 million aggregate, unless the parties otherwise agree in writing. Hospital will maintain policies of self-insured programs for general liability and other insurance in amounts consistent with general standards of hospital practice. Evidence of the insurance coverage required under this Section will be made available to Corporation upon request. Hospital will give Corporation at least fifteen (15) days' advance notice of cancellation or any modification of its medical malpractice insurance.

Corporation has and will maintain liability coverage consistent with the requirement imposed on it by law and, as necessary, to meet Corporation's obligations under this Agreement. This provision will survive termination of this Agreement, regardless of the cause-giving rise to such termination.

6.2     **NOTICE OF CLAIMS** - Hospital will promptly notify Corporation of the filing of any claim, or of any written notice of intent to file a claim against Hospital by a Member. Hospital will provide Corporation with any pertinent information related to such notices and claims that is requested by Corporation. Corporation will promptly notify Hospital of the initiation of legal action against Corporation by a Member concerning or relating to the services furnished by Hospital thereunder.

6.3     **INDEMNIFICATION** - Within the limits of Hospital's policies of professional and general liability insurance and to the extent not otherwise inconsistent with the laws of the relevant jurisdiction, each party will indemnify and hold harmless the other, its appointed boards, officers, employees, agents and subagents, individually and collectively, from all fines, claims, demands, suits or actions of any kind or nature arising by reason of the indemnifying party's acts or omissions in the course of its performance of its obligations under this Agreement. Nothing in this Agreement or in its performance will be construed to result in any person being the officer, servant, agent or employee of the other party when such person, absent this Agreement and its performance, would not in law have had such status.

## VII.     TERM AND TERMINATION

7.1     **TERM** - This Agreement will remain in effect for an initial term of two (2) years from the date first set forth above unless terminated by either party in accord with Section 7.3 or 7.4. After the initial term, this Agreement will continue in effect for additional one year terms unless terminated in accordance with the provisions of the Agreement. While termination of the Master Agreement will terminate Hospital's participation in all of Corporation's Provider Networks, Hospital's termination of its participation in any one or more of Corporation's Provider Networks may, at Corporation's discretion, result in the termination of Hospital's participation in any other Provider Networks in which Hospital participates. If either party does not wish this Agreement to continue in effect beyond its initial term, that party must notify the other party of this intention not later than October 1 of the last year of that initial term (and, if continued beyond the initial term, not later than October 1 of the final year of any such extension). At that time, either party may specify any changes in payment amounts or other terms and conditions which might provide the basis for continuation of the Agreement.

7.2     **TERMINATION WITHOUT CAUSE** -Either party may terminate this Master Agreement or Hospital's participation in any one or more of Corporation's Provider Networks at any time upon one hundred and twenty (120) days' prior written notice to the other party. This option may be exercised by either party "without cause" and does not require either party to establish or prove that there is cause for the termination or to disclose the basis of their decision to the other party.

Form 95-HVDC-2002

7.3    **IMMEDIATE TERMINATION** - Notwithstanding any other provision of this Agreement, Corporation may terminate this Master Agreement immediately upon notice to Hospital in the case of any of the following:

7.3-1    Hospital fails or refuses to provide or arrange for the provision of Covered Services to Members in a professionally acceptable manner;

7.3-2    Hospital's license is suspended, revoked or restricted in any material way that would affect the ability of Hospital to furnish Covered Services to Members;

7.3-3    Hospital's professional liability insurance, or self-insurance fund, as required by this Agreement, is terminated without replacement coverage being obtained;

7.3-4    Hospital is excluded from participation in the Medicare program;

7.3-5    Hospital's bankruptcy or insolvency; or

7.3-6    Hospital's knowing or deliberate submission of false or misleading billing information to Corporation.

7.4    **TERMINATION UPON BREACH** - The Master Agreement or Hospital's participation in any one or more of Corporation's Provider Networks may be terminated by either party for a material breach by the other of its obligations under this Agreement or any applicable Provider Network(s) by giving forty-five (45) days' written notice to the breaching party of the breach. Any such termination will be effective forty-five (45) days after the notice of termination is received if the other party has failed to cure the breach prior to the expiration of the thirty (30) day period immediately following receipt of such written notice.

7.5    **CONSENT NOT REQUIRED** - This Agreement may be terminated without the consent of any Member, Participating Provider or any other third party.

7.6    **CONTINUATION OF SERVICES AND PAYMENTS** - In the event of termination of this Master Agreement or Hospital's participation in any one or more of Corporation's Provider Networks, Corporation will reimburse Hospital in accordance with the terms of this Agreement and those of the applicable Provider Network for all Covered Services furnished to Members who are inpatients of Hospital on the date of termination, and Hospital will continue to provide necessary services to such Members during the remainder of such hospitalization. Corporation shall use good faith effort to transfer inpatients within ninety (90) days to participating hospitals so long as the transfer is medically appropriate. This provision will survive the termination of this Agreement, regardless of the cause giving rise to such termination.

7.7    **PRIOR ACTS** - In the event of termination of this Agreement for whatever reason, each party will remain liable for its activities or the activities of its employees or representatives during the term of the Agreement. Each party will retain the right to seek any redress available under law for any loss or injury caused by the other party's breach of its obligations under this Agreement.

7.8    **ACCESS TO RECORDS** - Notwithstanding termination of this Agreement or Hospital's participation in any one or more of Corporation's Provider Networks, Corporation or its designated agent will continue to have access to the records of Hospital for three (3) years, as necessary, to fulfill the terms of this Agreement.

Page 18 of 21

Form 95-HVDC-2002

**VIII.   AMENDMENTS** - This Master Agreement, as well as the terms of the Provider Networks in which Hospital participates, may be amended by Corporation as necessary to comply with all applicable laws or regulations issued by the Federal Government, the State of Maryland, the Commonwealth of Virginia, or the District of Columbia, and/or to meet any requirement imposed by the Blue Cross and Blue Shield Association, NCQA or other accreditation organizations, by giving thirty (30) days' prior written notice to Hospital of such amendment(s).  If an amendment is not acceptable to Hospital, Hospital may terminate participation in the Provider Network being amended or, if the amendment is to the Master Agreement itself, participation in all of Corporation's Provider Networks, by giving Corporation written notice no later than thirty (30) days after receipt of the written notice of the amendment. If Corporation does not receive a timely notice of termination from Hospital, Hospital will be deemed to have accepted such amendment as of its effective date. This Agreement or any part or section of it may also be amended at any time during the term of the Agreement by mutual consent in writing of the duly authorized representatives of the parties.  Either party may amend this Agreement as necessary to take into account any modification or changes that either party reasonably believes need to be made to comply with the requirements of HIPAA.

**IX.   GENERAL PROVISIONS**

9.1     **SEVERABILITY** - If any provision of this Agreement is rendered invalid or unenforceable by any state or federal statute or regulations or declared null and void by any court of competent jurisdiction, the remaining provisions of this Agreement will remain in full force and effect.

9.2     **ASSIGNMENT** - Either party may assign this Agreement to any entity that controls, is controlled by, or that is under common control with such party, now or in the future. For purposes of this provision the term "control" means either: (1) holding fifty (50%) percent or more of the outstanding voting securities of an entity; (2) having the contractual power presently to designate a majority of the directors of a corporation, or in the case of unincorporated entities, of individuals exercising similar functions; or (3) in the case of an entity without outstanding voting securities, having the right to fifty (50%) percent or more of the profits of the entity or the right, in the event of dissolution, to fifty (50%) percent or more of the assets of the entity.  Any other assignment not expressly set forth herein shall require the prior written consent of the other party.  The rights, obligations, and liabilities of both parties shall not be affected by any such assignment.

9.3     **DISPUTE RESOLUTION** – Both parties shall work cooperatively and in good faith to attempt to resolve issues on an informal basis within thirty (30) days of the first notification of a request.  In the event that a dispute concerning this Agreement cannot be satisfactorily resolved after reasonable efforts, at the option of either party, the dispute may be settled by arbitration in accordance with the rules and regulations of the American Arbitration Association then in effect.  Such arbitration may be initiated by any party making a written demand for arbitration on the other party within thirty (30) days of the time the dispute arises.

Within thirty (30) days of that demand, Corporation and Hospital will designate an arbitrator and give written notice of such designation to the other.  Within ten (10) days after these notices have been received, the two arbitrators selected by this process will select a third arbitrator and give notice of the selection to Corporation and Hospital.  The three arbitrators will hold a hearing and decide the matter within thirty (30) days thereafter.  The results of the arbitration will be final and binding on both parties.

Judgment upon and award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  Corporation will pay the fee of the arbitrator it chooses, Hospital will pay the fee of the arbitrator Hospital chooses and the parties will share equally the fee of the third arbitrator.

Form 95-HVDC-2002

9.4    **BINDING EFFECT** - This Agreement will be binding upon and inure to the benefit of the respective successors and assigns of Corporation and Hospital.

9.5    **WAIVER OF BREACH** - Waiver of a breach of any provision of this Agreement will not be deemed a waiver of any other breach of the same or different provision.

9.6    **IMPOSSIBILITY OF PERFORMANCE** - Neither party will be deemed to be in violation of this Agreement if it is prevented from performing its obligations by events beyond its control including, without limitations, acts of God or of the public enemy, flood or storm, strikes, or statute, rule or action of the government or agency. The parties will make a good faith effort, however, to assure that Members have access to Hospital's services, consistent with applicable law, despite such events.

9.7    **NOTICES** - Any notice required to be given pursuant to the terms and provisions hereof will be in writing and will be sent by any means capable of verifying receipt, to the parties at the addresses set forth below. The parties may change the address at which notice is to be given by supplying written notice of the change in advance.

9.8    **GOVERNING LAW** - This Agreement will be governed by laws of the jurisdiction in which services are being rendered.

9.9    **HEADINGS** - The headings contained in this Agreement are for reference purposes only and will not affect the meaning or interpretation of this Agreement.

9.10    **ENTIRE AGREEMENT** - This Agreement, its appendices, any amendments thereto promulgated pursuant to Section VIII of this Agreement and any documents incorporated by reference constitute the entire agreement between Corporation and Hospital. It supersedes all prior written or oral understandings between the parties relating to the subject matter of this Agreement.

Form 95-HVDC-2002

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their duly authorized representatives on the date and year written below.

**WASHINGTON HOSPITAL CENTER**

By: ___Eric R. Wagner___

Title: ___Senior Vice President, Managed Care___

Signature: _(signature)_

Date: ___1-22-04___

**GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC.**

By: ___M. Bruce Edwards___

Title: ___Vice President, Networks Management___

Signature: _(signature)_

Date: ___1/22/04___

**CAREFIRST BLUECHOICE, INC.**

By: ___M. Bruce Edwards___

Title: ___Vice President, Networks Management___

Signature: _(signature)_

Date: ___1/22/04___

Address to be used for notices for Washington Hospital Center:

Medstar Health
5565 Sterrett Place
Columbia, MD 21044

Address to be used in notices for GHMSI and CareFirst BlueChoice, Inc.:

CareFirst BlueCross BlueShield
10455 Mills Run Circle
P.O. Box 825
Owings Mills, MD 21117-0825
Mail Stop CG-51
Attn: Institutional Contracting

Form 95-HVDC-2002